BANK ONE, MILWAUKEE, N.A., Plaintiff-Appellant, v. LOEBER MOTORS, INC., et al., Defendants-Appellees.

First District (1st Division)    Nos. 1—95—3550, 1—96—1499 cons.

Opinion filed November 10, 1997.

16

Vedder, Price, Kaufman & Kammholz, of Chicago (Richard F. Zehnle, Diane M. Kehl, and James V. Garvey, of counsel), for appellant.

Rudnick & Wolfe, of Chicago (Gerald B. Lurie and Tracy L. Bradford, of counsel), for appellee Loeber Motors, Inc.

Fuchs & Roselli, Ltd., of Chicago (Paul Hansfield and Mark H. Schiff, of counsel), for appellee Liberty Buick Company, Inc.

Crivello, Carlson, Mentkowski & Steeves, S.C., of Milwaukee, Wisconsin (Patrick L. Wells, James H. Hauser, and Timothy F. Mentkowski, of counsel), for appellee Bob Krumpholz Chevrolet-Buick, Inc.

JUSTICE GALLAGHER delivered the opinion of the court:

Plaintiff, Bank One, Milwaukee, N.A. (Bank One), filed a complaint in chancery against several automobile dealerships, namely, Loeber Motors, Liberty Buick, Bob Krumpholz Chevrolet-Buick, McHenry Jeep-Eagle, Perillo BMW, Perillo Lincoln-Mercury, and Highland Park Lincoln-Mercury (hereinafter the dealers or defendants). By filing its complaint, Bank One sought to enjoin the dealers from repossessing 10 vehicles and a declaratory judgment establishing Bank One as the rightful owner of said vehicles. The trial court issued a temporary restraining order against the defendants in order to preserve the status quo. After the parties exchanged documents and deposed witnesses, both Bank One and the defendant dealers filed cross-motions for summary judgment. The trial court denied Bank One's motion for summary judgment, but granted summary judgment in favor of the dealers and awarded them damages. Bank One then filed this appeal.

The material facts are not in dispute. Bank One's business activities include the purchasing of motor vehicles and the leasing of said vehicles to consumers. To this end, Bank One enters into "dealer agreements" with new car dealers. Pursuant to these agreements, the dealers undertake to arrange lease financing through Bank One for their customers. Essentially, the dealers find the lessee, order the car to be leased (or locate it on their auto lot), set up the lease terms and then present the entire package to Bank One. Once the dealer presents the proper documentation and Bank One approves of the lessee and the terms, Bank One signs the lease and purchases the car from the dealer. Bank One also enters into dealer agreements with automobile leasing companies; the leasing companies perform the same task as the new car dealers, but instead of ordering the desired car from the manufacturer, a leasing company simply locates the car at a new car dealership and purchases it. Bank One then buys the

car from the leasing company. Bank One has entered into dealer agreements with some 2,000 new car dealers (or originating dealers) and with roughly 35 leasing companies (or private lessors).[1]

On July 7, 1992, Bank One entered into a dealer agreement with Valet Automobile Leasing, Inc. (Valet), an entity Bank One recognized as a leasing company/private lessor. Among other things, the agreement obliged Valet to "assist [a lessee] in the preparation of the application, individual lease, security agreement and other documents." Valet also made several warranties in the agreement, particularly as to the genuineness of a given lessee's signature and the truth of the facts contained in all documents submitted to Bank One.

Valet, in turn, had an oral arrangement with Leased Car Sales (Leased Car). Although Leased Car was not a licensed new car dealer, it was licensed as a used car dealer and engaged in the purchase and resale of automobiles. It also arranged automobile leases. Pursuant to their oral arrangement, Leased Car agreed to find lessees, locate automobiles and arrange lease transactions; Valet agreed to submit the proposed leases to Bank One according to its dealer agreement. If Bank One approved, it would pay Valet and purchase the auto that was the subject of the lease. Valet then paid Leased Car. In short, Leased Car performed Valet's duties under the Valet-Bank One dealer agreement, and Valet presented the lease package to Bank One as if Valet had organized it. The record demonstrates that no relationship ever existed between Bank One and Leased Car. Furthermore, according to the definition used by Bank One employees, Leased Car was merely another private lessor or leasing company and not an originating dealer.

Before Bank One approved a lease and purchased a car, the signatory to the dealer agreement had to provide Bank One with several documents outlined on Bank One's "Freedom Lease Checklist." These documents included: the invoice or MSRP (manufacturer's suggested retail price) for the vehicle; the lease agreement signed by the customer; title/registration to the vehicle indicating Bank One as owner; and the certificate of origin (CO) for the vehicle (referred to as the MSO or manufacturer's statement of origin), among several other

---

[1]Jay Loop, a sales manager of Bank One who oversees its leasing operation, testified in his deposition as to the distinction between originating dealers and private lessors:

> "What I call a 'private lessor.' [sic] Somebody who's not an originating dealer is my term on that; that doesn't have cars sitting out on their lot and CO's [certificates of origin] in their file [sic]."

documents. Where Bank One dealt with leasing companies rather than originating dealers, it required that the leasing company submit a copy of the certificate of origin showing an assignment of the CO to Bank One.

For the vehicles at issue in this litigation, a typical transaction proceeded as follows. Leased Car would either contact or be contacted by prospective lessees. After determining what type of car the lessee desired, Leased Car would contact various originating or new car dealerships looking for an automobile matching that type. If Leased Car succeeded in locating such an automobile, it would then request from the relevant dealer reproductions of several documents required under Bank One's "Freedom Lease Checklist." In particular, the dealer would, via facsimile, send Leased Car copies of both sides of a particular vehicle's CO. Leased Car would then prepare a counterfeit CO, which falsely showed a chain of assignments from the original new car dealer to Leased Car, and then to Bank One. Employees of Leased Car would fraudulently sign the counterfeit COs on behalf of the new car dealer that originally owned the vehicle.

Next, Leased Car would prepare the necessary lease documents and then forward all of the documents Bank One required under its checklist—including the counterfeit COs—to Valet. Valet would then present the entire lease package to Bank One; upon Bank One's approval of the lease package, Bank One would make out a check to Valet for the price of the car, plus an additional amount to cover the state sales tax. Valet would then pay Leased Car.

Finally, after receiving payment from Valet, a representative of Leased Car would return to the relevant dealership, present a postdated check, and then drive away with that particular automobile for which the Bank One lease had been prepared, delivering it to the lessee. As part of each of these transactions, the various dealers would complete an Illinois Department of Revenue ST-556 sales tax transaction form for each vehicle. The completed form would indicate the reason why the original dealer was exempt from paying sales tax—because the vehicles were to be resold by Leased Car. Customarily, the dealer would retain possession of the original CO until it received full payment for the automobile in question (*i.e.*, until Leased Car's check cleared).

Significantly, in the documents submitted to Bank One by Valet, the selling price of each vehicle was always less than the amount Leased Car paid to the originating dealer. As mentioned above, in addition to the selling price, Bank One gave Valet sufficient funds to pay the (diminished) state sales tax; presumably, these funds were forwarded to Leased Car as well. However, the record reflects that, in

all but two instances, Valet did not forward Leased Car funds equivalent even to the original purchase price of the automobile. Moreover, after accounting for the sales tax on each transaction, Bank One never tendered Leased Car (through Valet) funds sufficient to cover Leased Car's costs. In essence, then, Leased Car purchased each of the cars at issue here only to immediately resell them at a loss. The inexorable—if unsurprising—result of this scheme was that when the defendant dealers attempted to cash the checks tendered by Leased Car, those checks bounced. The defendants moved to repossess the cars, and Bank One filed suit on April 27, 1995, seeking, among other things, a declaration as to who rightfully owned the vehicles.

Incidentally, deposition testimony indicated that back in October of 1994, Bank One became aware of titling problems with certain other vehicles it had purchased pursuant to its dealer agreement with Valet. To wit, the vehicle identification numbers (VINs) on the titles received by Bank One did not match the VINs shown on Bank One's lease documents.[2] As a result, Bank One set up special payment procedures unique to Valet.[3] Yet the transactions forming the basis for this litigation took place in January, February and March of 1995. Thus, Bank One recognized that its leasing business procedures were suspect—particularly with respect to Valet—well before it attempted to purchase the vehicles at issue here.

■ Before the trial court, Bank One premised its claim to ownership of the vehicles on the entrustment doctrine as laid out in the Uniform Commercial Code, which states: "Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business." 810 ILCS 5/2—403(2) (West 1994). The doctrine applies only where the following elements are met: (1) an actual entrustment of the goods by the delivery of possession to a merchant; (2) the party that receives the goods must be a merchant who deals in goods of that kind; (3) the merchant must sell the entrusted goods; and (4) the purchaser must be a buyer in the ordinary course of busi-

---

[2]Apparently, this problem persisted. Two of the vehicles disputed here, delivered from Loeber Motors to Leased Car, do not bear the same VINs as the lease documents submitted by Leased Car to Valet (and ultimately to Bank One).

[3]Previously, Valet had been permitted to draw on a "dealer's account" set up by Bank One to expedite the payment process. Under this scheme, Bank One permitted its dealers to issue their own drafts for payment on approved leases. After October 1994, Bank One terminated Valet's drafting privileges and made subsequent payments with cashier's checks.

ness. *Kahr v. Markland,* 187 Ill. App. 3d 603, 607, 543 N.E.2d 579, 582 (1989).

In its summary judgment motion, Bank One argued that the defendant dealers entrusted the automobiles to Leased Car by giving Leased Car possession of the vehicles, that Leased Car was a merchant dealing in goods of that kind, that Leased Car sold the automobiles to Bank One, and that Bank One bought the automobiles in the ordinary course of its business. The dealers moved for summary judgment as well, asserting that Leased Car was not a merchant dealing in goods of the kind at issue here, because Leased Car was a used car dealer and not a new car dealer; the dealers also argued that Bank One was not a buyer in the ordinary course.

The trial court granted summary judgment in favor of the defendant dealers. It appeared to premise its holding on the fact that Leased Car was not a merchant that dealt in the sale of new cars, as Leased Car did not hold a state license to sell new cars. However, Bank One later filed a motion to reconsider, and in ruling on that motion the court stated that it had not buttressed its decision solely upon the licensing question. Instead, the trial court suggested that it had also found Bank One not to be a buyer of the vehicles in the ordinary course of business.

On appeal, Bank One contends that it was entitled to summary judgment because the trial court erred when it held that the entrustment doctrine did not apply to make Bank One the rightful owner of the 10 vehicles at issue in this litigation. We confine our review to the issues of (1) whether Leased Car Sales was a merchant dealing in goods of the kind at issue in these transactions, and (2) whether Bank One purchased the subject vehicles from Leased Car (through Valet) in the ordinary course of business.

■ Appellate review of an order granting summary judgment is *de novo*; the appellate court must consider anew the facts and law related to the case and determine whether the trial court was correct. *Soderlund Brothers, Inc. v. Carrier Corp.,* 278 Ill. App. 3d 606, 614, 663 N.E.2d 1, 7 (1995). Of course, normally the determination of whether one is a buyer in the ordinary course of business is a question of fact, and a court's findings on that issue will not be overturned unless they run contrary to the manifest weight of the evidence. *Bank of Illinois v. Dye,* 163 Ill. App. 3d 1018, 1021, 517 N.E.2d 38, 40 (1987). However, this case comes before us after the trial court ruled on cross-motions for summary judgment. Where the facts are basically uncontroverted and the real issue is the trial court's application of the law to such facts, a question of law is presented and the manifest weight of the evidence standard does not apply. *South Sub-*

*urban Safeway Lines, Inc. v. Regional Transportation Authority*, 166 Ill. App. 3d 361, 365, 519 N.E.2d 1005, 1008 (1988); *Jacobson v. General Finance Corp.*, 227 Ill. App. 3d 1089, 1093, 592 N.E.2d 1121, 1124 (1992). Therefore, this court may proceed with its *de novo* review and need not defer to the findings of the trial court.

■ Bank One first contends that the trial court erred when it held that Leased Car was not a merchant "who deals in goods of that kind" for purposes of the entrustment statute. 810 ILCS 5/2—403(2) (West 1994). In support of its contention, Bank One directs this court to an opinion of the United States Court of Appeals for the Seventh Circuit, *Shacket v. Philko Aviation, Inc.*, 681 F.2d 506 (7th Cir. 1982), *rev'd on other grounds*, 462 U.S. 406, 76 L. Ed. 2d 678, 103 S. Ct. 2476 (1983). In that case, Smith Aircraft, a dealer in used aircraft, sold a new, custom-built aircraft to Mr. and Mrs. Shacket. *Shacket*, 681 F.2d at 508. Smith then attempted to sell the same aircraft to Philko Aviation, even though the Shackets had already taken possession of the plane. 681 F.2d at 508. The court held that, under Illinois law, all of the elements to entrustment were present and that the Shackets had acquired good title to the aircraft. 681 F.2d at 512. In holding that the used/new distinction did not defeat entrustment, the court stated:

> "The term 'goods of that kind' is not limited to the same goods but encompasses goods of the same fundamental nature. That Smith Aircraft was in the business of selling aircraft on a commercial basis is sufficient to permit Smith Aircraft to pass good title to a buyer in the ordinary course." 681 F.2d at 511.

The defendant dealers attempt to distinguish *Shacket* on the ground that no evidence appears in the record to support the contention that Leased Car actually ever sold used automobiles to entities such as Bank One. We reject this argument, inasmuch as it overlooks the fact that Leased Car *was licensed* as a used car dealer.

On a different tack, defendants argue that Leased Car could not legally sell the vehicles at issue in this litigation because it was not licensed as a new car dealer, as required under the Illinois Vehicle Code (625 ILCS 5/5—101 (West 1994)). As defendants correctly point out, that statute is a comprehensive and detailed statement of the public policy of Illinois. See generally 625 ILCS 5/5—101(a) (West 1994). According to defendants, a finding that Leased Car was a merchant dealing in "goods of that kind" for entrustment purposes would contradict the expressed public policy of this State.

In our opinion, even though Leased Car may have violated state law by selling new cars without a license to do so, it was licensed to sell "goods of the same fundamental nature." *Shacket*, 681 F.2d at

511. Furthermore, the entrustment statute provides that entrusting "includes any delivery and any acquiescence in retention of possession *** regardless of whether the procurement of the entrusting or possessor's disposition of the goods ha[s] been such as to be larcenous under the criminal law." 810 ILCS 5/2—403(3) (West 1994). Because larceny, an equal if not greater transgression against the public policy of Illinois, does not operate to defeat entrustment, we hold that Leased Car's lack of a license to sell new cars likewise fails to defeat application of the entrustment doctrine in this case. Accordingly, we disagree with the trial court's holding that the entrustment provision of the Uniform Commercial Code did not apply here simply because Leased Car was not a licensed new car dealer.

■ This court must now determine whether Bank One qualified as a buyer in the ordinary course of business when it purchased these vehicles through Valet from Leased Car. As discussed above, although this determination is one of fact that normally will not be overturned unless it contradicts the manifest weight of the evidence, we consider it here *de novo* because all parties concede that the material facts are undisputed. Section 1—201(9) of the Uniform Commercial Code defines a "buyer in the ordinary course of business" as follows:

> "[A] person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in [the] ordinary course from a person in the business of selling goods of that kind ***." 810 ILCS 5/1—201(9) (West 1994).

The parties do not challenge this definition of a "buyer in the ordinary course." However, the parties offer competing definitions of "good faith" under the Code. Bank One asserts that " 'Good Faith' means honesty in fact in the conduct or transaction concerned." 810 ILCS 5/1—201(19) (West 1994). By contrast, the dealers urge that Bank One—itself a merchant—must be subject to the higher standard set forth in the sales article of the Uniform Commercial Code: " 'Good Faith' in the case of a merchant means honesty in fact *and the observance of reasonable commercial standards of fair dealing in the trade*." (Emphasis added.) 810 ILCS 5/2—103(b) (West 1994). As an initial matter, then, we shall decide which "good faith" standard applies to the present case.

■ The Uniform Commercial Code offers the following definition of "merchant":

> "a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom

such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill." 810 ILCS 5/2—104(1) (West 1994).

Bank One insists that it cannot be considered a merchant in this case because it never held itself out as a "dealer" of cars or as one "having knowledge or skill peculiar" to vehicles. We reject Bank One's position. The record unequivocally demonstrates that Bank One indeed had "knowledge or skill peculiar to the practices *** involved in the transaction[s]" that form the basis of this litigation. By its own admission, Bank One has been engaged in the business of leasing automobiles for several years. Bank One has entered into dealer agreements with some 2,000 originating car dealers and 35 private lessors. Through these agreements, Bank One essentially has solicited its affiliated dealers and private lessors to organize automobile lease packages and then sell them to Bank One. Bank One's knowledge and skill regarding the practices involved in automobile lease financing is further evidenced by its elaborate checklist and procedures for approving such transactions. Clearly, Bank One qualifies as a "merchant" with respect to the transactions at issue here.

■ Having determined that Bank One acted as a "merchant" with respect to these transactions, we find instructive the Official Code Comment to section 1—201(19), which states:

" 'Good Faith' whenever it is used in the Code, means at least what is here stated. In certain Articles, by specific provision, additional requirements are made applicable. See, e.g., Secs. 2—103(1)(b), 7—404. To illustrate, in the Article on Sales, Section 2—103, good faith is expressly defined as including in the case of a merchant observance of reasonable commercial standards of fair dealing in the trade, *so that throughout that Article wherever a merchant appears in the case an inquiry into his observance of such standards is necessary to determine his good faith."* (Emphasis added.) 810 ILCS Ann. 5/1—201(19), Uniform Commercial Code Comment, at 27 (Smith-Hurd 1993).

Because this case falls under the sales article of the Uniform Commercial Code, we hold that for Bank One to qualify as a buyer in the ordinary course, it must meet the heightened "good faith" standard of a merchant required under that article. *Cf. Massey-Ferguson, Inc. v. Helland*, 105 Ill. App. 3d 648, 653, 434 N.E.2d 295, 298 (1982) ("good faith" definition from sales article did not apply where the case arose out of a secured transaction).

■ Assuming Bank One purchased these 10 vehicles with honesty in fact, we next consider whether Bank One observed reasonable commercial standards of fair dealing in the trade. One aspect of

these transactions that this court finds intriguing is that Bank One never paid the full price for the automobiles in question. As discussed previously, Bank One forwarded Leased Car funds (through Valet) to cover the price of the automobile and the sales tax due. However, Bank One always purchased the vehicles for less than Leased Car had paid to the original dealers; Leased Car, therefore, was forced to sell each automobile at issue here for a loss. Furthermore, Bank One must have known it received (often substantial) discounts because its "Freedom Lease Checklist" required that the invoice or MSRP be submitted. As aptly stated in a case frequently cited by Bank One, "[t]he amount of consideration given is significant as evidence of good faith." *Heinrich v. Titus-Will Sales, Inc.*, 73 Wash. App. 147, 156, 868 P.2d 169, 174 (1994) (where ultimate consumer paid merchant more than merchant agreed to pay entrusting original owner, merchant's fraudulent conduct did not taint purchaser's title under entrustment statute). See also *Bank of Illinois v. Dye*, 163 Ill. App. 3d at 1021-22, 517 N.E.2d at 40-41 (fact that the seller sold vehicle for the same price for which he had purchased it contributed to a finding that the sale was not "in the ordinary course of business"). Moreover, the record indicates that every time Bank One purchased one of these automobiles at a discount, it deprived the state of substantial revenue. The fact that Bank One continuously purchased vehicles from an entity that lost money on each transaction, while also depriving the state of its rightful revenue, suggests to us that Bank One did not observe reasonable commercial standards of fair dealing in the trade.

Our conclusion is bolstered by Bank One's awareness, as of October 1994, of the titling problems with some of the automobiles it had purchased through its agreement with Valet. Bank One responds by asserting that its relationship to Valet has no bearing on its status as a buyer in the ordinary course. We disagree. So far as the record reflects, Valet is the *only entity* in these transactions with which Bank One actually had any dealings or agreements. In October 1994, Bank One learned that several of the vehicles its lessees were driving were not the vehicles reflected in the lease papers. This discovery alarmed Bank One to the point that it altered its payment procedures toward Valet. Yet Bank One took no further action and continued to do business through Valet; in fact, Bank One's altered payment procedures did not even preclude the same titling problems from recurring. We believe this commercially unreasonable decision—the continuation of business with Valet, or at least the failure to better inspect the verity of documents received from Valet—directly led to the transactions that form the basis of this litigation.

Finally, the fact that "[a]ll the documentary evidence (*e.g.*, bills

of sale, tax documents, etc.) in this case conclusively demonstrates," in Bank One's language, that Leased Car sold these automobiles to Bank One does not strengthen plaintiff's position. This documentary evidence merely begs the question of why Bank One never signed a dealer agreement with Leased Car Sales. If the documents submitted to Bank One showed that it was purchasing these automobiles from Leased Car, why did Bank One persist in paying Leased Car through an unnecessary intermediary? According to Bank One's own definition, Leased Car was a private lessor, identical to Valet. Normally, this extra layer of middleman should have increased Bank One's costs, as one would expect each intermediary to make some profit. However, Bank One knew it was purchasing automobiles at a discount—despite the fact that, according to Bank One, the documentary evidence clearly demonstrated this extra intermediary. We find that, under these facts, by engaging in these transactions Bank One did not observe reasonable commercial standards of fair dealing in the trade.

We agree, then, with the trial court's finding that Bank One did not qualify as a buyer in the ordinary course of business for the transactions at issue here. As a result, Bank One may not claim the protection of the entrustment provision of the Uniform Commercial Code. We therefore affirm the judgment of the trial court.

Affirmed.

CAMPBELL, P.J., and O'BRIEN, J., concur.