Maurice SHACKET and Sylvia Shacket, Plaintiffs-Appellees,

v.

PHILKO AVIATION, INC., Defendant-Appellant.

No. 81–1249.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 4, 1982.

Decided June 22, 1982.

---

6. We form no conclusions as to whether habeas corpus proceedings might have been appropriate in this case.

508

James C. Murray, Jr., Margaret Garms, Katten, Muchin, Zavis, Pearl & Galler, Chicago, Ill., for plaintiffs-appellees.

Leslie R. Bishop, Bishop & Crawford, Ltd., Oak Brook, Ill., for defendant-appellant.

Before PELL, Circuit Judge, MARKEY,* Chief Judge, and SPRECHER,** Circuit Judge.

MARKEY, Chief Judge.

Appeal from a judgment of the district court for the Northern District of Illinois declaring title to an aircraft by way of summary judgment granted to Maurice and Sylvia Shacket. We affirm.

*Background*

In April 1978, Roger Smith Aircraft Sales, Inc. (Smith Aircraft) sold a new, custom-built Piper Navajo aircraft, registration number N78MS, to Maurice and Sylvia Shacket, who took possession at that time. Subsequently, Smith Aircraft purported to sell the same aircraft to Philko Aviation Company (Philko), the "sale" being financed by Sandwich State Bank (Bank),

which purported to take a security interest in the aircraft.

The Shackets brought suit for a judgment declaring their right of ownership in the aircraft. The Shackets and Philko filed motions for summary judgment. Judge Shadur granted summary judgment in favor of the Shackets. Philko's motion for reconsideration was denied, but the court modified its prior opinion respecting certain factual matters and terminology.

*Background*

Maurice Shacket, a private pilot and aircraft owner for many years, and his wife Sylvia, contracted with Smith Aircraft in 1977 to buy the aircraft for $126,000 plus the trade-in of an aircraft valued at $120,000, giving a check for $20,000 as a down payment. Smith Aircraft, engaged in buying and selling used aircraft, contracted to purchase the new aircraft from Clark Aviation, Inc. (Clark), a Piper franchisee. The Shackets were aware of the arrangements between Smith Aircraft and Clark, and were in contact with Kenneth Rittenhouse, Clark's president and principal shareholder, regarding customizing of the aircraft before final delivery. Citing financial problems Clark had with Smith Aircraft, Rittenhouse requested that he be present at the closing and advised the Shackets not to pay Smith Aircraft unless he was there. The Shackets agreed.

Before the closing, Smith Aircraft located a customer for its resale of the trade-in aircraft. The Shackets relinquished possession of that aircraft for delivery to that customer, keeping the title papers as presumed security for the transaction.

At the closing, Mr. Shacket asked Rittenhouse whether it was all right to close the purchase and Rittenhouse said it was, though Rittenhouse had not yet received full payment from Smith Aircraft. The Shackets then endorsed two cashiers' checks, aggregating $106,000, in favor of

* Howard T. Markey, Chief Judge of the United States Court of Customs and Patent Appeals, is sitting by designation.

** Judge Robert A. Sprecher was present at oral argument and at the post-argument conference but was unable to review the opinion before his death.

Smith Aircraft. Rittenhouse showed the Shackets the aircraft and handed them various manuals, the certificate of airworthiness, and the keys. The Shackets subsequently returned home in the new aircraft and have retained possession ever since.

The present controversy is in part generated by failure of Roger Smith, president of Smith Aircraft, to give the Shackets all the proper bills of sale reflecting the chain of title in the aircraft, and in part by Smith's "sale" of the same aircraft to two different parties. Telling the Shackets that the legal title could not be delivered at closing because of uncompleted clerical work, Smith supplied the buyer's copy of the bill of sale, and photocopies of bills of sale covering prior transfers of the aircraft and said he would "take care of the paperwork." The Shackets understood that to mean Smith would record the bills of sale as part of the "paperwork." No recording of the Shackets' interest was accomplished.

Through Smith, Edward McArdle learned of an aircraft operation (Philko) for sale at the Aurora Municipal Airport. McArdle purchased Philko, becoming its president and principal stockholder, and leasing its operations to Smith Aircraft. Under the lease arrangement, Smith Aircraft would continue existing operations under Philko's name, accounting to Philko for all expenses and receipts.[1] Smith Aircraft was permitted to use Philko's buildings for Smith Aircraft's used aircraft sales and charter business. McArdle extended his personal credit and the credit of his companies to assist Smith Aircraft, guaranteeing $100,000 of its $500,000 line of credit and loaning it $80,000. When Smith approached McArdle concerning the Piper aircraft in question, Smith Aircraft owed Philko $60,000 on the loan.

Two days after closing with Shackets, Smith told McArdle he needed $152,000 to complete purchase of the same aircraft he had already sold and delivered to the Shackets, telling him the aircraft was to be sold to Krueger Aviation Inc., a California cor-

poration (Krueger). Smith said the Bank would not advance funds to complete the transaction because an advance would exceed his line of credit and showed McArdle a copy of a purported purchase order signed by Krueger. Smith told McArdle the sale would enable him to erase the $60,000 debt to Philko.

After McArdle and the Bank examined the original prior bills of sale exhibited by Smith, and checked the title against Federal Aviation Administration (FAA) records, McArdle agreed that Philko would take title to the plane from Smith Aircraft. All the proceeds of the Krueger sale would be credited to Smith Aircraft ($152,000 being repaid to the Bank, $60,000 being applied to payment of the Philko loan, and the balance going to Smith Aircraft). The Bank subsequently recorded with the FAA the bill of sale to Philko and the Bank loan agreement, though Philko never received physical possession of the Piper aircraft.

### Issues

1. Did the district court err in concluding that state law governs validity of the transfers of the aircraft?

2. Did the district court err in concluding that under state law the Shackets obtained title to the aircraft as a result of their purchase from Smith Aircraft?

3. Did the trial court err in concluding that under state law Philko did not obtain title to the aircraft?

4. Were there genuine issues of material fact sufficient to preclude grant of summary judgment to the Shackets?

### OPINION

1. *Effect of the Shackets' Failure to Record*

█ Under the Federal Aviation Act of 1958 (Act), 49 U.S.C. § 1301 et seq., Congress established a system for national reg-

---

1. The Philko operations included the sale of oil and gasoline, operation of a flight school, air-craft maintenance and repair, and the sale of new aircraft.

istration of conveyances and encumbrances affecting aircraft. Registration entails filing an application for registration with the FAA in Oklahoma City, disclosing prescribed information about the owner, evidence of ownership, and a filing fee. Upon acceptance of the application, the interest is recorded and a certificate of registration issued. Section 1403 of the Act recites the broad range of conveyances included within the scope of the recording system and further provides at section (c):

> § 1403(c) No conveyance or instrument, the recording of which is provided for by [§ 1403(a)] shall be valid in respect of such aircraft, aircraft engine or engines, propellers, appliances, or spare parts against any person other than the person by whom the conveyance or other instrument is made or given, his heir or devisee, or any person having actual notice thereof, until such conveyance or other instrument is filed for recordation in the office of the Administrator.

Philko argues that § 1403(c) preempts state law and invalidates any conveyance of an aircraft without recordation. Any federal preemption however is limited by the terms of 49 U.S.C. §§ 1401(f) and 1406. The former provides that the FAA issued certificate of registration shall not be evidence of ownership in any proceeding where ownership is in issue. Congress indicated a further deference to state law in 1964 when it enacted § 1406.

> § 1406 The validity of any instrument the recording of which is provided for by section 1403 of this title shall be governed by the laws of the State, District of Columbia, or territory or possession of the United States in which such instrument is delivered . . . .

The extent to which the Act effects priorities between claimants under successive transactions involving the same aircraft must therefore be limited. In *Sanders v. M. D. Aircraft Sales, Inc.*, 575 F.2d 1086 (3rd Cir. 1978), the court noted:

> [T]here has been preemption by federal law only to the limited extent that Congress has sensibly federalized choice of law, thereby freeing aircraft financing from the forum shopping which the rule of *Klaxon Co. v. Stentor Elec. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), might otherwise produce.

*Id.* at 1088; also quoted in *Bitzer-Croft Motors, Inc. v. Pioneer Bank & Trust Co.*, 82 Ill.App.3d 1, 37 Ill.Dec. 247, 401 N.E.2d 1340, 1345 (1980).

Since the enactment of § 1406, numerous courts have adopted the view that the Act is subject to UCC principles of good faith purchaser status, actual notice, and the rights of a buyer in the ordinary course, as Judge Shadur determined the Shackets to be.[2] Thus, though the manner of recordation and choice of law question are resolved under the Act, the underlying validity and effect of an instrument are subject to applicable state law. We therefore conclude that the Act does not preempt all state laws governing priorities among security interests, and that the interests of the parties in the aircraft in this case must be determined by reference to state law.

### 2. The Shackets' Interest Under State Law

The state law applicable to the sale of goods in Illinois is the Uniform Commercial Code (UCC).[3] UCC § 1–201(9) defines a buyer in the ordinary course of business.

---

**2.** *E.g., Sanders v. M. D. Aircraft Sales Inc., supra; Bitzer-Croft Motors Inc. v. Pioneer Bank & Trust Co., supra; Haynes v. General Electric Credit Corp.*, 582 F.2d 869 (4th Cir. 1978); *State Securities Co. v. Aviation Enterprises*, 355 F.2d 225 (10th Cir. 1968); *No. Illinois v. Biship Distributing*, 284 F.Supp. 121 (D.C.Mich.1968); *but see, Dowell v. Beach Ac-*

*ceptance Corporation, Inc.*, 3 Cal.3d 544, 91 Cal.Rptr. 1, 476 P.2d 401 (1970).

**3.** Under § 1406 of the Act, Illinois law governs the transaction between Clark, Smith Aircraft, the Shackets, Bishop and Philko. In each case the transaction took place, and the instrument evidencing the respective interests was delivered, in Illinois.

(9) "Buyer in ordinary course of business" means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind but does not include a pawnbroker. "Buying" may be for cash or by exchange of other property or on secured or unsecured credit and includes receiving goods or documents of title under a preexisting contract for sale but does not include a transfer in bulk or as security for or in total or partial satisfaction of a money debt.

Having paid Smith Aircraft $126,000 in cash and turned over possession of a trade-in aircraft, the Shackets are clearly "buyers" under § 1–201(9) and purchasers who have given value under §§ 1–201(32), (44). As Judge Shadur noted, the good faith of the Shackets was demonstrated when they specifically asked Rittenhouse whether it was alright to close on the purchase, and were told that it was. The Shackets were under no obligation to monitor Smith Aircraft's financial arrangements with Clark, and therefore their failure to know of Smith Aircraft's outstanding financial obligations to Clark raises no issue of good faith.

■ It is unquestioned that Clark had good title to the new aircraft, was in the business of selling new aircraft, and entrusted possession of the new aircraft to Smith Aircraft. That Smith Aircraft was only in the business of selling used aircraft, as Philko asserts, does not detract from its ability to transfer the good title of Clark to the Shackets. Under UCC § 2–403(2) the effect of entrustment of goods to one who deals in goods "of that kind" is to pass all rights of Clark to the Shackets, as buyers in the ordinary course of business.[4] The term "goods of that kind" is not limited to the same goods but encompasses goods of the same fundamental nature. That Smith Aircraft was in the business of selling aircraft on a commercial basis is sufficient to permit Smith Aircraft to pass good title to a buyer in the ordinary course.

■ Illinois case law illustrates the effect of § 2–403(2). In *Coffman Truck Sales v. Sackley Cartage Co.*, 58 Ill.App.3d 68, 15 Ill.Dec. 554, 373 N.E.2d 1026 (1978), the Illinois Appellate Court applied that section, holding that a buyer from a resale dealer who purchases in an ordinary transaction is a buyer in due course and therefore obtains title of the first dealer, even if the resale dealer failed to remit payment for the goods to the first dealer.

Similarly, the Shackets, as buyers in the ordinary course from Smith Aircraft, obtained the title entrusted by Clark to Smith Aircraft, notwithstanding any difficulties in the title of Smith Aircraft.[5]

Philko's argument that Smith Aircraft acted as an agent of the Shackets (and therefore could not have passed good title to them) ignores the evidence. In denying a motion to modify judgment, Judge Shadur quoted from his own opinion:

[T]he mark of an agency relationship here would be that "if Smith Aircraft were acting as an agent and not as a principal for its own account, the purchase transaction with Clark, including the price of the aircraft as negotiated by Smith, would have been for the direct benefit of Shacket".... If an *agent* makes a deal for his

---

4. UCC § 2–403(2) provides: "Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business." *See also, Bank of Hendersonville v. Red Baron Flying Club, Inc.*, 571 S.W.2d 152 (Tenn.App.1977), *cert. denied* (Tenn.1978), *cert. denied*, 439 U.S. 1089, 99 S.Ct. 872, 59 L.Ed.2d 56 (1979), holding that the entrustment doctrine applies to sales of aircraft.

5. As Judge Shadur noted, the Shackets could also predicate good title under UCC § 2–403(1) as good faith purchasers for value who, upon delivery of the goods, have acquired good title notwithstanding any voidable title in Smith Aircraft.

principal, the price that the agent commits for is the price the *principal* pays. That was plainly not so here, where Smith Aircraft was plainly dealing for its own account in the purchase from Clark Aircraft.

Accordingly, we find no error in Judge Shadur's determination that the Shackets obtained title to the aircraft as a result of the purchase from Smith Aircraft.

### 3. *Philko's Interest Under State Law*

■ Philko's claim under state law is twice flawed: it cannot be a buyer in ordinary course; and its failure to take possession precludes acquisition of good title as a good faith purchaser for value.

"Buying" under UCC § 1–201(9) specifically excludes transfers "as security for or in total or partial satisfaction of a money debt." Thus, a person may give "value" as defined in UCC § 1–201(44) (which specifically includes acquiring rights "as security for or in total or partial satisfaction of a pre-existing claim"), yet not be a "buyer" for purposes of UCC § 1–201(9).

Smith Aircraft owed Philko $60,000 on its $80,000 loan. Smith told Philko he could not obtain sufficient credit to buy the new aircraft, but if Philko would supply the purchase price, Smith Aircraft would resell the aircraft and repay both the purchase price and the $60,000 balance. As the district court noted:

> Thus it is plain from his own testimony McArdle had no interest in the sale price to be paid by Krueger Aviation, except to make sure it was adequate to pay the

bank loan and the $60,000 balance owed to Philko. That is the conclusive hallmark of a *credit* transaction not a purchase. . . . Philko was acting to accommodate Smith Aircraft (though its purpose of course was the legitimate one of obtaining repayment of an existing debt), not to take the risks of profit and loss that are the essence of a true purchase. . . . Philko's acquisition of title was by way of security.

Because "buying" does not include a transfer as security, Philko cannot be a "buyer" in the ordinary course.[6]

Whether Philko has the status of a good faith purchaser is of no consequence. Such status of itself cannot be the basis for good title in this case absent possession of the aircraft. At the time of the "sale" to Philko, Smith Aircraft had neither title to nor possession of the aircraft. Consequently, Philko could not under UCC § 2–403(1)[7] acquire good title from Smith Aircraft, whether any voidable title that may have arguably accrued to Smith Aircraft because it retained the title papers or otherwise.

Accordingly, under state law, Philko acquired no title to the aircraft.

### 4. *No Genuine Issue of Material Fact*

Rule 56(c), Fed.R.Civ.P., provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

---

**6.** Moreover, there was at the time of the "sale" to Philko no entrusting of possession in Smith Aircraft to predicate the passage of title to Philko under UCC § 2–403(2), *supra* at n.5.

**7.** UCC § 2–403(1) provides:
(1) A purchaser of goods acquires all title which his transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased. A person with voidable title has power to transfer a good title to a good faith purchaser for value. When

goods have been delivered under a transaction of purchase the purchaser has such power even though
(a) the transferor was deceived as to the identity of the purchaser, or
(b) the delivery was in exchange for a check which is later dishonored, or
(c) it was agreed that the transaction was to be "cash sale," or
(d) the delivery was procured through fraud punishable as larcenous under the criminal law.

law." Philko asserts that six issues of material fact exist: (1) whether the Shackets were guilty of bad faith; (2) whether the Shackets were buyers in the ordinary course of business; (3) whether Smith Aircraft was in the business of selling goods of that kind; (4) whether there was an agency relationship between Smith Aircraft and the Shackets; (5) whether title to the trade-in aircraft passed; and (6) whether the proceeds from the proposed sale to Krueger inured to the benefit of Philko or Smith Aircraft.[8]

■ Respecting (1) and (5), Philko questions the honesty of the Shackets, suggesting that there might have been additional terms in the Shackets-Smith Aircraft transaction that were not stated in the record, noting particularly the Shackets' retention of title to the trade-in aircraft pending delivery of title to the new aircraft. Philko suggests that the Shackets and Smith Aircraft might have agreed that title would not pass until the exchange of the legal title papers. That conjecture, however, is an insufficient response to the direct evidence demonstrating the Shackets' good faith at the time of the transaction, as indicated by payment in full, upon approval of Rittenhouse, and their understanding that the "paperwork" was being completed by Smith Aircraft. No issue of material fact touching the Shackets' good faith has been shown to exist.

■ Assertions (2), (3), and (4), relate not to fact issues but to legal conclusions drawn in this case from undisputed evidence in the record. Philko's suggestion that factual disputes may underlie resolution of those issues is a poor substitute for record evidence that would conflict with Judge Shadur's determinations. Philko's assertions (2), (3), and (4) fail to demonstrate existence of any issue of material fact.

■ Assertion (6) was resolved in the testimony of McArdle.

[Smith said] that he had sold an airplane to Krueger Aviation ... for $280 or $290 [thousand dollars] ... [Smith] said that he wanted—he had gone to the bank and requested financing for the balance of the purchase of $152,000. And the bank told him that if they loaned him $150,000 it would be beyond his line of credit, words to that effect.... and he said that if I purchased this airplane, when this buyer, Krueger Aviation, was going to purchase—would purchase the thing from me, witnessed the fact that I had a contract here signed by Krueger, I would receive my $152,000 or whatever it was plus the $60,000 from the proceeds of the sale. And of course the difference—it would be profit to him and Krueger, I guess.

Philko points to no evidence in the record to contradict the obvious conclusion that, at least in McArdle's mind, Smith Aircraft was to receive all of the profit on the purported resale to Krueger. Philko's assertion (6) therefore fails to demonstrate any issue of material fact sufficient to preclude summary judgment to the Shackets.

There being no error in Judge Shadur's grant of summary judgment to the Shackets, the same is affirmed.

---

8. Mere allegations or denials in the pleadings are insufficient to establish genuine issues for trial. Rule 56(e) Fed.R.Civ.P.