Michael **MADRID** and Pamela Madrid, Appellants–Plaintiffs,

v.

**BLOOMINGTON AUTO COMPANY, INC. d/b/a Royal Lincoln Mercury Nissan, Appellee–Defendant.**

No. 79A04–0206–CV–277.

Court of Appeals of Indiana.

Jan. 22, 2003.

Jason W. Bennett, Stuart P. Boehning, Bennett Boehning & Clary, Lafayette, IN, Attorneys for Appellants.

Geoffrey M. Grodner, Kendra Gowdy Gherdingen, Mallor Clendening Grodner & Bohrer, Bloomington, IN, Attorneys for Appellee.

Steve Carter, Attorney General of Indiana, David L. Steiner, Mary Ann Wehmueller, Deputy Attorney General, Indianapolis, IN, for Amicus Curiae.

## OPINION

SHARPNACK, Judge.

Michael and Pamela Madrid (the "Madrids") appeal the trial court's denial of a motion for summary judgment filed by the Madrids, the trial court's grant of a cross-motion for summary judgment filed by Bloomington Auto Company, Inc., d/b/a Royal Lincoln Mercury Nissan ("Royal"), and the denial of a motion to correct error filed by the Madrids.[1] The Madrids raise two issues, which we restate as:

1. In their appellant's brief and reply brief, the Madrids placed their citations in the footnotes "for ease of reading the body text, not to defeat length limitations or contravene" Ind. Appellate Rule 22. Appellant's Brief at 2, n. 1. However, we have disapproved of this practice. *See, e.g., Quigg Trucking v. Nagy,* 770 N.E.2d 408, 414 n. 1 (Ind.Ct.App.2002)

I. Whether legal title to a motor vehicle is governed by Indiana's Certificate of Title Act or the sales provisions of Indiana's Uniform Commercial Code ("UCC"); and

II. Whether the purchasers of a motor vehicle received legal title to the vehicle pursuant to Ind.Code § 26-1-2-403, the entrustment provisions of the UCC.

We reverse and remand.

The relevant facts designated by the parties in their summary judgment motions follow. The Madrids and Michael Madrid's company had previously purchased both new and used vehicles from Gary Pratt University Motors, Inc. ("University Motors"). University Motors is a used car dealer in West Lafayette, Indiana. In May 2001, the Madrids became interested in purchasing a Lincoln Navigator and asked University Motors to locate "one with low miles that was 'loaded.'" Appellants' Appendix at 111. On June 1, 2001, Gary Pratt located a new 2000–model–year Navigator at Royal's dealership in Bloomington, Indiana. Pratt called Royal's sales manager and stated that he had a customer who was interested in the Navigator. Pratt asked if Royal would bring the Navigator to University Motors so that the customer could inspect the vehicle.

Several times in the past, University Motors had requested that Royal drive a new vehicle to University Motors so that University Motors could show the vehicle to a potential customer. If the customer decided to purchase the vehicle, a Royal employee would fill out the sales paper-

work and the customer would pay Royal directly for the vehicle. Royal would then pay University Motors a finder's fee for "putting Royal in contact with the customer." *Id.* at 119. Because University Motors is not an authorized Lincoln dealership, it is prohibited from selling new Lincoln vehicles. *See* Ind.Code § 9-23-3-4 (1998) ("It is an unfair practice for a dealer to sell any new motor vehicle having a trade name, trade or service mark, or related characteristics for which the dealer does not have a franchise in effect at the time of the sale."). To sell a new Lincoln directly to a customer, University Motors would have to purchase the vehicle from Royal and pay state sales tax. University Motors would then sell the vehicle to a customer, and the customer would also be required to pay state sales tax.

Rather than purchase the vehicle from Royal, University Motors agreed to receive a finder's fee from Royal if University Motors had a customer for the vehicle. A Royal employee drove the Navigator to University Motors on June 2, 2001 so that University Motors could show the Navigator to the Madrids. Royal retained the vehicle's certificate of origin, built-in mobile phone, owner's manuals, and extra keys. The same day, the Madrids came to University Motors to look at the vehicle. Pratt told the Madrids that University Motors had purchased the Navigator for $40,000 and he would like to make $3,000 on the sale to them. They agreed on a purchase price of $41,500. After the Madrids paid the purchase price and took possession of the vehicle, University Motors promised to deliver the title, paper-

---

(noting that the "practice of providing cites in footnotes fails to comply with the requirement in [Ind. Appellate Rule] 22 that a party follow the dictates of the Uniform System of Citation (Bluebook)"). Furthermore, the Madrids' attention is directed to Ind. Appellate Rule 46(A)(10) which requires an appellant's brief to "include any written opinion, memorandum of decision or findings of fact and conclusions thereon relating to the issues raised on appeal."

work, and mobile phone the next day by Federal Express. Despite daily telephone calls from the Madrids, University Motors never delivered any of the documents or vehicle accessories to the Madrids.

Royal also called University Motors for updates regarding the potential sale of the Navigator. Pratt first told Royal that "he was 99% sure that the customers were going to buy the Navigator and that he was going to get a non-refundable deposit for the vehicle." Appellants' Appendix at 122–123. Royal reminded Pratt that all payments had to be made to Royal. The next day, Pratt told Royal that the customers were out of town, but would purchase the Navigator when they returned. Pratt continued to give Royal various excuses until June 23, 2001, when Royal learned that there was a police seizure at University Motors. Royal's general manager drove to West Lafayette to retrieve the Navigator, but was informed that the Navigator was not one of the vehicles seized. Pratt informed Royal that the customers had possession of the Navigator.

The Madrids filed a complaint against Royal and University Motors requesting that Royal surrender the title to the Madrids or that the trial court "administratively issue title to the vehicle" to the Madrids. *Id.* at 9. The Madrids filed a motion for summary judgment, and Royal filed a cross-motion for summary judgment. The trial court granted Royal's cross-motion for summary judgment and denied the Madrids' motion for summary judgment. Specifically, the trial court found that Royal was entitled to summary judgment under Ind.Code § 9–17, Indiana's Certificate of Title Act, "because Royal preserved its ownership of the vehicle by retaining the [certificate of origin] and, therefore, as a matter of law, the Navigator, or its equivalent monetary value, must be returned to Royal." *Id.* at 73.

Alternatively, the trial court found that under Ind.Code § 26–1–2, the sales provisions of the UCC, Royal retained ownership of the Navigator because: (1) Royal did not "entrust" the vehicle to University Motors; (2) University Motors was not a "merchant who deals in goods of that kind;" and (3) the Madrids knew or should have known that University Motors was not authorized to sell them the new vehicle and did not own the vehicle. *Id.* at 75. The trial court also noted that no Indiana court has discussed the effect of the current Indiana Certificate of Title Act on the sales provisions of the UCC. However, relying upon cases from Ohio and Texas, the trial court held that even assuming that Royal entrusted the Navigator to University Motors within the meaning of the UCC, "Royal is still the owner of the Navigator, because a dealer cannot sell a vehicle without giving the buyer a [certificate of origin]." *Id.* at 76. The Madrids filed a motion to correct error, which the trial court denied.

■■■ Our standard of review for a trial court's grant of a motion for summary judgment is well settled. On appeal, the standard of review of a grant or denial of a motion for summary judgment is the same as that used in the trial court: summary judgment is appropriate only where the designated evidence shows that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. *Corr v. Am. Family Ins.,* 767 N.E.2d 535, 537–538 (Ind.2002). The moving party must designate sufficient evidence to eliminate any genuine factual issues, and once the moving party has done so, the burden shifts to the nonmoving party to come forth with contrary evidence. *Shambaugh & Son, Inc. v. Carlisle,* 763 N.E.2d 459, 460–461 (Ind.2002). The court must accept as true those facts alleged by the nonmoving party, construe

the evidence in favor of the nonmoving party, and resolve all doubts against the moving party. *Id.* The fact that the parties made cross-motions for summary judgment does not alter our standard of review. *Hartford Acc. & Indem. Co. v. Dana Corp.,* 690 N.E.2d 285, 291 (Ind.Ct. App.1997), *trans. denied.* Instead, we must consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law. *Id.*

▮ Where a trial court enters findings of fact and conclusions thereon in granting a motion for summary judgment, as the trial court did in this case, the entry of specific findings and conclusions does not alter the nature of our review. *Rice v. Strunk,* 670 N.E.2d 1280, 1283 (Ind.1996). In the summary judgment context, we are not bound by the trial court's specific findings of fact and conclusions thereon. *Id.* They merely aid our review by providing us with a statement of reasons for the trial court's actions. *Id.*

## I.

The first issue is whether legal title to a motor vehicle is governed by Indiana's Certificate of Title Act or the sales provisions of the UCC. According to the Madrids, two separate motor vehicle certificate of title structures are utilized by states—an "ownership" system and a "registration" system. Appellant's Brief at 7–8. Under an ownership system, "legal title does not pass until a title certificate passes" and the certificate of title statutes displace standard commercial law with respect to motor vehicle ownership. *Id.* at 11. Under a registration system, standard commercial law governs automobile ownership and a certificate of title only creates a right to register and use a vehicle on public roads.

The Madrids argue that prior to the enactment of Indiana's current Certificate of Title Act in 1991, we had interpreted Indiana's title acts as a registration system rather than an ownership system. The Madrids assert that the enactment of the new Certificate of Title Act in 1991 did not change this focus of the Act. The trial court, according to the Madrids, misconstrued the relationship between the Indiana Certificate of Title Act and the UCC "breaking from this Court's long-established precedent, and adopting cases from other States interpreting fundamentally different 'ownership-type' title acts." *Id.* at 7. Thus, the Madrids contend that the Indiana Certificate of Title Act does not mandate a finding for Royal. Rather, this case should be analyzed under the UCC's provisions on sales, particularly Ind.Code § 26–1–2–403.

▮ This case requires us to interpret the sales provisions of the UCC, the pre–1991 and 1991 Indiana Certificate of Title Acts, and the relationship between the statutes. When interpreting a statute, we independently review a statute's meaning and apply it to the facts of the case under review. *Bolin v. Wingert,* 764 N.E.2d 201, 204 (Ind.2002). Thus, we need not defer to a trial court's interpretation of the statute's meaning. *Elmer Buchta Trucking, Inc. v. Stanley,* 744 N.E.2d 939, 942 (Ind. 2001).

▮ "The first step in interpreting any Indiana statute is to determine whether the legislature has spoken clearly and unambiguously on the point in question." *St. Vincent Hosp. and Health Care Center, Inc. v. Steele,* 766 N.E.2d 699, 703–704 (Ind.2002). If a statute is unambiguous, we must give the statute its clear and plain meaning. *Bolin,* 764 N.E.2d at 204. A statute is unambiguous if it is not susceptible to more than one interpretation. *Elmer Buchta Trucking,* 744 N.E.2d at 942.

However, if a statute is susceptible to multiple interpretations, we must try to ascertain the legislature's intent and interpret the statute so as to effectuate that intent. *Bolin*, 764 N.E.2d at 204. We presume the legislature intended logical application of the language used in the statute, so as to avoid unjust or absurd results. *Id.*

We begin with an analysis of Indiana's Certificate of Title Act. Indiana's current Certificate of Title Act, which is found at Ind.Code § 9–17 and was enacted in 1991, provides generally that "a person may not operate or permit to be operated upon the highways a motor vehicle ... under an Indiana registration number unless a certificate of title has been issued ... for the motor vehicle...." Ind.Code § 9–17–2–13 (1998). Within sixty days of becoming an Indiana resident, "a person must obtain a certificate of title for all vehicles owned by the person" that are subject to the motor vehicle excise tax and will be operated in Indiana. Ind.Code § 9–17–2–1 (Supp. 2001); *see also* 140 IAC 6–1–2 ("Any person who purchases or otherwise acquires a new or used motor vehicle ... must apply for a certificate of title in the purchaser's or transferee's name."). If the Bureau of Motor Vehicles "is satisfied that the person applying for a certificate of title is the owner of the vehicle ... the bureau may issue a certificate of title for the vehicle." Ind.Code § 9–17–2–10 (1998).

Once a certificate of title is obtained, it "is valid for as long as the vehicle for which the certificate of title has been issued is owned or held by the person who originally held the certificate of title." Ind.Code § 9–17–3–1 (1998). If a vehicle is sold or the ownership is transferred, the holder of the certificate of title must deliver the certificate of title to the purchaser or transferee at the time of the sale or delivery except under certain circumstances where the certificate of title may

be delivered within twenty-one days of the sale or delivery. Ind.Code § 9–17–3–3 (1998).

If a certificate of title "has not previously been issued for a vehicle in Indiana, an application for a certificate of title must be accompanied by a manufacturer's certificate of origin...." Ind.Code § 9–17–2–4 (1998). The "certificate of origin" refers "to the original ownership document for a vehicle issued by a manufacturer and provided to the initial purchaser of that vehicle so as to begin the chain of ownership of that vehicle." 140 IAC 3.5–1–6. Ind.Code § 9–17–8–1 (1998) provides that:

A manufacturer, converter manufacturer, dealer, or other person may not sell or otherwise dispose of a new motor vehicle to another person, to be used by the other person for purposes of display or resale, without delivering to the other person a manufacturer's certificate of origin under this chapter that indicates the assignments of the certificate of origin necessary to show the ownership of the title to a person who purchases the motor vehicle.

Additionally, Ind.Code § 9–17–8–2 (1998) provides that "[a] person may not purchase or acquire a new motor vehicle without obtaining from the seller of the motor vehicle a valid manufacturer's certificate of origin." Pursuant to this provision, Royal argues that the Madrids did not obtain legal title to the vehicle because they never received the vehicle's certificate of origin.

To support its argument, Royal relies upon *Saturn of Kings Automall, Inc. v. Mike Albert Leasing, Inc.*, 92 Ohio St.3d 513, 751 N.E.2d 1019 (2001). However, the case is distinguishable. There, the Ohio Supreme Court held that, in determining competing claims of ownership of a motor vehicle, Ohio's Certificate of Motor Vehicle Title Law controls over the provisions of Ohio's Uniform Commercial Code.

*Id.* at 1025. However, Ohio's Certificate of Motor Vehicle Title Law is substantially different than Indiana's Certificate of Title Act. Ohio's statute provides:

> No person acquiring a motor vehicle from its owner, whether the owner is a manufacturer, importer, dealer, or any other person, *shall acquire any right, title, claim, or interest in or to the motor vehicle until there is issued to the person a certificate of title to the motor vehicle,* or delivered to the person a manufacturer's or importer's certificate for it; and no waiver or estoppel operates in favor of such person against a person having possession of the certificate of title to, or manufacturer's or importer's certificate for, the motor vehicle, for a valuable consideration.

*Id.* at 1021 (quoting R.C. 4505.04(A) (emphasis added)).

Indiana's Certificate of Title Act provides no such limitation on the passing of "any right, title, claim, or interest" in the vehicle until a certificate of title is issued. Although Ind.Code § 9–17–8–2 provides that "[a] person may not purchase or acquire a new motor vehicle without obtaining from the seller of the motor vehicle a valid manufacturer's certificate of origin," the statute does not expressly limit the passing of legal title until the certificate of title is issued. Rather, Indiana's Certificate of Title Act expressly conditions issuance of a certificate of title upon ownership of a vehicle. *See, e.g.,* I.C. § 9–17–2–10 ("If the bureau is satisfied that the person applying for a certificate of title *is the owner of the vehicle* or is otherwise entitled to have the vehicle registered in the person's name, the bureau may issue a certificate of title for the vehicle.") (emphasis added). Thus, we do not find Royal's argument persuasive.

The Madrids argue that the 1991 enactment of the Certificate of Title Act did not change the focus and intent of the prior statute. Prior to 1991, certificates of title were governed by Ind.Code § 9–1–2–1 to – 4 (repealed 1991). Ind.Code § 9–1–2–1(j) (repealed 1991) provided that "[i]t is unlawful for a person to operate or permit to be operated upon the public highways a motor vehicle ... under an Indiana registration number unless a certificate of title has been issued under this section." Further, the Act provided that "[i]f satisfied that the applicant is the lawful owner of the vehicle or is otherwise entitled to have the same registered in the applicant's name, the department may issue an appropriate certificate of title." I.C. § 9–1–2–1(a) (repealed 1991).

The Act further provided that "[i]n the event of the sale or transfer of ownership of such vehicle, for which an original certificate of title has been issued heretofore, the original holder of such certificate shall ... deliver the same to the purchaser or transferee at the time of the sale or delivery to him of such vehicle." Ind.Code § 9–1–2–2(a) (repealed 1991). However, Ind.Code § 9–1–2–3(a) (repealed 1991) provided that:

> [n]o manufacturer, converter manufacturer, dealer, or other person may sell or otherwise dispose of a new motor vehicle to a dealer or any person, to be used by such dealer or person for purposes of display or resale, without delivering to such dealer a manufacturer's certificate of origin in accordance with the provisions of this chapter and with such assignments thereon as may be necessary to show title to the purchaser thereof. The dealer or person may not purchase or acquire a new motor vehicle without obtaining from the seller a valid manufacturer's certificate of origin.

We do not see significant substantive changes in the relevant portions of the pre–1991 and 1991 statutes. The legisla-

tive intent behind P.L. 2–1991, which repealed Ind.Code § 9–1–2–1 to –4, was "to amend the Indiana Code to codify, revise or rearrange laws concerning motor vehicles." The relevant provisions were, for the most part, simply rearranged into separate sections and slightly reworded. The intent behind the pre–1991 and 1991 statutes appears to be the same and cases interpreting the pre–1991 statutes provide guidance in this case. *Weatherholt v. Spencer County*, 639 N.E.2d 354, 356 (Ind. Ct.App.1994) (holding that current and former versions of a statute were substantially the same and the former statute provided guidance), *reh'g denied.*

Having discussed the pre–1991 and 1991 Certificate of Title Act, we now briefly turn to the relevant sales provisions of the UCC. Ind.Code § 26–1–2–401 (Supp.2001) provides that under the sales provisions of the UCC, "[u]nless otherwise explicitly agreed, title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place." Moreover, "[a]ny entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business." Ind.Code § 26–1–2–403 (Supp.2001). The Madrids contend that they are entitled to legal title to the vehicle under these provisions.

The sales provisions of the UCC do not "impair or repeal" Indiana's Certificate of Title Act. Ind.Code § 26–1–2–102 (1998). Furthermore, because the UCC is a "general statute intended as a unified coverage of its subject matter, no part of it shall be deemed to be impliedly repealed by subsequent legislation if such construction can reasonably be avoided." Ind.Code § 26–

1–1–104 (1998). Thus, we must attempt to give effect to both the sales provisions of the UCC and the Indiana Certificate of Title Act if such an interpretation is possible.

We have previously discussed the relationship between the pre–1991 Certificate of Title Act and the UCC in the context of motor vehicle sales. Under the pre–1991 statute, we held that ownership of a vehicle is not dependent upon possessing a certificate of title. For example, in *Pekin Ins. Co. v. Charlie Rowe Chevrolet, Inc.*, 556 N.E.2d 1367, 1370 (Ind.Ct.App.1990), we observed that:

> [c]ertificate of title is not of itself proof of ownership or legal title to the vehicle.... A person may have legal title in a vehicle even though he does not possess a certificate of title. Because failing to possess a certificate of title does not indicate absolutely that a person does not have legal title to an automobile, the determination of when a person has legal title is controlled by the application of the commercial code.

Thus, under the pre–1991 statutes, legal title to a vehicle was governed by the sales provisions of the UCC rather than the certificate of title statutes.

Our holding in *DBC Capital Fund, Inc. v. Snodgrass*, 551 N.E.2d 475, 477 (Ind.Ct. App.1990), is also instructive. There, DBC entered into an agreement with Devers Auto Sales ("Devers") whereby Devers gave DBC a security interest in Devers' inventory of vehicles. *Id.* at 475. Snodgrass purchased a used vehicle from Devers, and Devers informed her that the certificate of title would be mailed to her. *Id.* However, Devers did not pay DBC for its security interest on the vehicle and did not provide Snodgrass with the certificate of title. *Id.* DBC later informed Snodgrass that it had the certificate of title to the vehicle and would not release the title

unless Snodgrass paid its lien of $4,200. *Id.* at 475–476. The trial court held that Snodgrass was entitled to the certificate of title to the vehicle. *Id.* at 476.

On appeal, DBC argued that Snodgrass was not a buyer in the ordinary course of business pursuant to the UCC because she failed to demand delivery of the certificate of title at the time of the purchase as required by Ind.Code § 9–1–2–2(a) (repealed 1991) and Ind.Code § 9–1–2–3(b) (repealed 1991). *Id.* at 476–477. We observed that "[i]t is true that if there are grounds for suspecting that a security interest is being imperiled by the mode of dealing, a transaction cannot be considered in the ordinary course of business." *Id.* at 477. However, we held that Ind.Code § 9–1–2–2(a) (repealed 1991) and Ind.Code § 9–1–2–3(b) (repealed 1991) did not create a duty on behalf of a purchaser to demand delivery of the certificate of title to an automobile at the time of sale. *Id.* Absent such a duty, nothing in the evidence suggested that Snodgrass was not a buyer in the ordinary course of business pursuant to the UCC. *Id.* Thus, we held that the trial court did not err by determining that Snodgrass was entitled to the certificate of title to the vehicle. *Id.* Likewise, here, Ind.Code § 9–17–8–2 did not create a duty on behalf of the Madrids to demand a certificate of origin at the time of the sale.

■■■ Given the correlation between the pre–1991 and 1991 Certificate of Title Acts, we find *Pekin Ins. Co.* and *DBC Capital Fund* persuasive and conclude that the Madrids are correct that Indiana's current Certificate of Title Act creates a "registration" type system rather than an "ownership" type system. Mindful of Ind. Code § 26–1–2–102, which provides that sales provisions of the UCC do not "impair or repeal" Indiana's Certificate of Title Act, we note that our interpretation does not impair the Certificate of Title Act. Rather, this interpretation gives effect to both statutes. Thus, we conclude that the trial court erred when it determined that the legal ownership of the vehicle is determined by Indiana's Certificate of Title Act. Rather, legal ownership of vehicles is determined by the sales provisions of the UCC. *See, e.g., Pekin Ins. Co.,* 556 N.E.2d at 1370.

## II.

Having determined that legal title to a motor vehicle is governed by the sales provisions of the UCC rather than the Indiana Certificate of Title Act, we must now determine whether the Madrids received legal title to the vehicle pursuant to Ind.Code § 26–1–2–403, the entrustment provisions of the UCC. As previously noted, the sales provisions of the UCC provide that "[u]nless otherwise explicitly agreed, title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place...." I.C. § 26–1–2–401(2). Further, Ind.Code § 26–1–2–403(2) provides that "[a]ny entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business." The trial court held that Royal did not entrust the Navigator to University Motors, University Motors was not a merchant who deals in goods of the same kind as Royal, and the Madrids knew or should have known that University Motors was not an authorized Lincoln new car dealer and did not own the vehicle.

The Madrids first argue that the trial court erred by determining that University Motors was not a merchant who deals in

goods of the same kind as Royal. Ind. Code § 26–1–2–403(2) applies only if the goods are entrusted "to a merchant who deals in goods of that kind. . . ." Royal argues that University Motors was not an authorized Lincoln new car dealer and statutorily could not deal in new Lincoln cars. See I.C. § 9–23–3–4. Thus, according to Royal, University Motors was not a merchant who deals in goods of that kind, i.e. a merchant who deals in new Lincoln cars. However, Royal cites no authority for this proposition.

The Madrids contend that Royal's interpretation is too narrow. The Madrids argue that it is sufficient that both University Motors and Royal were car dealers. The Madrids rely upon Shacket v. Philko Aviation, Inc., 681 F.2d 506 (7th Cir.1982), cert. granted in part, 459 U.S. 1069, 103 S.Ct. 487, 74 L.Ed.2d 630 (1982), rev'd on other grounds, 462 U.S. 406, 103 S.Ct. 2476, 76 L.Ed.2d 678 (1983). In Shacket, a dealer of new airplanes ("Dealer") entrusted possession of a new airplane to dealer of used airplanes ("Seller"). 681 F.2d at 508–509. The dealer of used airplanes proceeded to "sell" the airplane to two separate buyers. Id. The Seventh Circuit held that even though Seller was only in the business of selling used aircraft, it could still transfer the good title of the Dealer to a buyer. Id. at 511. "The term 'goods of that kind' is not limited to the same goods but encompasses goods of the same fundamental nature." Id. The fact that the Seller "was in the business of selling aircraft on a commercial basis is sufficient to permit [it] to pass good title to a buyer in the ordinary course." Id.

■ We find Shacket to be persuasive. It is sufficient for purposes of Ind.Code § 26–1–2–403(2) that University Motors and Royal were both merchants of "goods of the same fundamental nature." Id. Thus, even though University Motors sold used vehicles and Royal sold new vehicles, Royal placed the Navigator with "a merchant who deals in goods of that kind" by loaning it to University Motors. See, e.g., id.

■ The Madrids next argue that the trial court erred by determining that Royal did not entrust the Navigator to University Motors. Ind.Code § 26–1–2–403(3) (Supp.2001) defines "entrusting" to include "any delivery and any acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery or acquiescence and regardless of whether the procurement of the entrusting or the possessor's disposition of the goods have been such as to be theft under the criminal law." The trial court held that the vehicle was not entrusted to University Motors "because the vehicle was only brought to University Motors so the Madrids could inspect the vehicle." Appellant's Appendix at 75. However, entrustment expressly includes "any delivery and any acquiescence in retention." I.C. § 26–1–2–403(3). Royal agreed to deliver the vehicle to University Motors so that University Motors could show the vehicle to the Madrids. Royal acquiesced in University Motors' retention of the vehicle despite University Motors' repeated excuses regarding why the Madrids had not yet purchased the vehicle. These actions fall within the definition of entrustment pursuant to Ind.Code § 26–1–2–403.

The trial court also held that it was "unlikely that the Madrids took possession of the vehicle without notice of the true owner's identity" and the Madrids "knew, or should have known, that University Motors was not an authorized Lincoln car dealer." Appellant's Appendix at 75. The trial court essentially held that the Madrids were not buyers in the ordinary course of business. A "buyer in ordinary course of business" is a

person that buys goods in good faith without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person, other than a pawnbroker, in the business of selling goods of that kind. A person buys goods in the ordinary course of business if the sale to the person comports with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practices. . . .

Ind.Code § 26–1–1–201(9). No evidence was designated that the Madrids knew that the sale violated Royal's rights. Pratt told the Madrids that University Motors had purchased the Navigator. The only evidence designated that raises an inference that the sale was outside the ordinary course of business is the failure of University Motors to provide a certificate of origin at the time of the sale to the Madrids. However, as noted in Part I, *supra,* we held under the pre–1991 statutes that the failure of a buyer to demand a certificate of title at the time of the sale did not result in the buyer losing its status as a buyer in the ordinary course of business. *See, e.g., DBC Capital Fund,* 551 N.E.2d at 477 (holding that a purchaser of a vehicle was a buyer in the ordinary course of business even though the car dealer did not provide the certificate of title at the time of the sale). Thus, we conclude that the Madrids were buyers in the ordinary course of business. *See, e.g., id.*

 Furthermore, we observe the policy behind Ind.Code § 26–1–2–403. Ind.Code § 26–1–2–403:

was intended to determine the priorities between the two innocent parties: (1)

the original owner who parts with his goods through fraudulent conduct of another and (2) an innocent third party who gives value for the goods to the perpetrator of the fraud without knowledge of the fraud. By favoring the innocent third party, the Uniform Commercial Code endeavors to promote the flow of commerce by placing the burden of ascertaining and preventing fraudulent transactions on the one in the best position to prevent them, the original seller.

*Mowan v. Anweiler,* 454 N.E.2d 436, 439 (Ind.Ct.App.1983) (quoting *Sacks v. State,* 172 Ind.App. 185, 360 N.E.2d 21 (1977), *reh'g denied*). Here, we must determine the priorities between two innocent parties, Royal and the Madrids. The policy behind the UCC is to favor the Madrids because, as between the Madrids and Royal, Royal was in the best position to prevent the fraudulent transaction.[2]

 We conclude that the trial court erred when it found that: (1) Royal did not entrust the vehicle to University Motors; (2) University Motors was not a merchant dealing in goods of the same kind as Royal; and (3) the Madrids were not buyers in the ordinary course of business. Consequently, under Ind.Code § 26–1–2–403, when Royal entrusted the vehicle to University Motors, University Motors received the power to transfer all rights of Royal to the Madrids and the Madrids received legal title to the vehicle even though they did not receive the certificate of origin. Thus, the trial court erred when it denied the Madrids' motion for summary judgment.

For the foregoing reasons, we reverse the trial court's grant of Royal's motion for summary judgment and the trial court's

---

2. The Attorney General of Indiana filed an amicus curiae brief in support of the Madrids. The Attorney General noted that its Consumer Protection Division "routinely receives consumer complaints involving vehicle title non-delivery issues" and that such consumer complaints have "dramatically escalated in recent years." Amicus Curiae's Brief at 1.

denial of the Madrids' motion for summary judgment and remand for proceedings consistent with this opinion.

Reversed and remanded.

KIRSCH and SULLIVAN, JJ., concur.